## PARILLA et al. v. UNITED STATES.

(Circuit Court of Appeals, Sixth Circuit. May 12, 1922.)

### No. 3617.

1. **Conspiracy ⬳47—Proof of overt act, usually done pursuant to previous scheme, tends to show conspiracy.**

   On a trial for conspiracy, proof of overt acts of a class usually, if not necessarily, done pursuant to a previous scheme and plan, has a substantial tendency to show a pre-existing conspiracy.

2. **Internal revenue ⬳47—Evidence held to show intent to evade tax on whisky withdrawn from bond ostensibly for export.**

   Where defendants, after withdrawing whisky from a bonded warehouse on an export bond, removed the whisky from the barrels in which it was contained and substituted water, by means of a hole that could be covered beyond observation, and left all export permits and marks on the barrels, a finding was warranted of an intent to evade payment of the tax, and not merely to escape provisions of the War Prohibition Act, preventing the withdrawal of the whisky, except for export, even on payment of the tax, though the regulations required re-examination at the point of export.

3. **Internal revenue ⬳47—Inference of intent to refill whisky barrels with water to avoid payment of tax held warranted.**

   Where whisky barrels withdrawn from a bonded warehouse ostensibly for export were traced to defendant's farm and found empty near by, having evidently been emptied through small holes intended to be covered

and concealed, to avoid payment of tax, the inference of an intent to refill them with water was warranted.

4. **Internal revenue ⬥⇒47—Whether defendant was party to evasion of tax and conspiracy to evade tax held for the jury.**

Where defendant was found holding a pump hose used in emptying barrels of whisky and refilling them with water, but claimed that he had just observed what was going on and was trying to take his brother away, whether this explanation was true, or whether he was a party to the offense of evading the tax on the whisky and conspiring to evade the tax, was for the jury.

5. **Criminal law ⬥⇒425—Statement made after conspiracy frustrated inadmissible against alleged conspirator.**

On a trial for removing and concealing whisky to evade payment of the tax and for conspiracy to do so, the statement of defendant's brother, after the conspiracy had been frustrated and not in defendant's presence, that he was transferring liquor under defendant's direction, was inadmissible.

6. **Witnesses ⬥⇒248(2)—Answer to question calling for statement of third person responsive, when it gave different statement.**

Where a witness was asked whether defendant's brother did not say that he had been transferring liquor himself, an answer that he did not, but said he was doing it under defendant's direction, was responsive.

7. **Criminal law ⬥⇒696(8)—Invited answer cannot be stricken out as hearsay, because not as expected.**

Where defendant's counsel asked a witness if defendant's brother did not say he was transferring liquor himself, the answer that he said he was doing it under defendant's direction could not be stricken out as hearsay on defendant's motion, as the question invited incompetent testimony.

8. **Criminal law ⬥⇒781(7)—Instruction as to failure of defendant to deny statement made in his presence not misleading, though inaccurate.**

A charge that, if a statement was made in defendant's presence and he kept silent, this would be evidence tending to show guilt, though inaccurate, in that the statement was immaterial, unless made in defendant's hearing, could not have misled the jury, as it must have been obvious to the jury that defendant could not be called on to deny a statement which he did not hear.

9. **Criminal law ⬥⇒409—Failure to deny statement, made when officers were making investigation, held to have evidentiary force.**

Where, at the time a statement incriminating defendant was made, no warrants had been issued, and prohibition officers were merely inquiring and investigating, defendant's failure to deny the statement had evidentiary force; he not being under duress.

In Error to the District Court of the United States for the Eastern Division of the Northern District of Ohio; D. C. Westenhaver, Judge.

Ralph Parilla and others were convicted of offenses, and they bring error. Affirmed.

E. H. Moore and W. R. Stewart, both of Youngstown, Ohio (Moore, Barnum & Hammond, of Youngstown, Ohio, on the brief), for plaintiffs in error.

Joseph C. Breitenstein, Asst. U. S. Atty., of Cleveland, Ohio.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DENISON, Circuit Judge.   The three respondents were indicted under section 37 of the Criminal Code (Comp. St. § 10201) for a conspiracy to move and conceal whisky in order to defraud the United

⬥⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

States of the tax thereon, and thereby to violate section 3450, R. S. (Comp. St. § 6352). This conspiracy charge was covered by the first count. The second count alleged a direct violation of section 3450. These three respondents were found guilty on both counts. They were sentenced to imprisonment in the penitentiary on the first, and to pay fines on the second.

Section 3450, as far as now material, reads as follows:

"* * * And every person who removes, deposits, or conceals, or is concerned in removing, depositing, or concealing any goods or commodities for or in respect whereof any tax is or shall be imposed, with intent to defraud the United States of such tax or any part thereof, shall be liable to a fine or penalty of not more than five hundred dollars. * * * "

At the time of the transaction involved, the Volstead Act (41 Stat. 305) had not taken effect. The War Prohibition Act (40 Stat. 1046 [Comp. St. Ann. Supp. 1919, §§ 3115$^{11}$/$_{12}$f–3115$^{11}$/$_{12}$gg]) was in force, and the result was that there was no lawful way in which the owners of beverage whisky in bond could get it out, excepting for export. The law (R. S. § 3330 [Comp. St. § 6125]) provided that, upon getting an export permit, the owners could withdraw the whisky from the warehouse without paying any tax, by giving a bond that they would pay it if the whisky were not, within a prescribed time, passed out of the country through the named port of export.

[1] Parilla and Dammeyer owned severally a considerable quantity of whisky in a bonded warehouse near Youngstown. The conspiracy alleged is that they planned with Friedman, a truckman, that they would get this out of the warehouse under permits for export through the port of Niagara Falls to Canada; that, while it was being transported by them from the warehouse to Niagara Falls, they would substitute water for the whisky in the barrels and export these barrels of water; and that they would thus be able to have the whisky in their possession and yet avoid the payment of the tax of $6.60 per gallon. The overt acts alleged were the carrying out of the plan, up and into the step of the water substitution. The proof was directed to these same acts; and as they are of the character which are usually, if not necessarily, done pursuant to a previous scheme and plan, proof of the acts has at least a substantial tendency to show a pre-existing conspiracy.

[2] Each of the defendants insists that a verdict of acquittal should have been instructed, because there was not sufficient evidence to support a verdict of guilty. This claim is largely based on the facts that a good export bond was given, that the regulations provided that the whisky must be re-examined at the point of export, that it would have been impossible to escape liability on the bond, and hence that the proper inference from the facts proved is that the respondents did not intend to evade paying the tax, but intended only to escape those provisions of the War Prohibition Act which prevented them from getting their whisky out of bond even on payment of the tax. This exonerating inference would be permissible from the proofs; but it is by no means the necessary inference. The jury was at liberty to find that the respondents did not understand that their scheme could not be carried through at Niagara Falls. They might have been ignorant of

the regulation requiring examination there, or they might have thought they could find a way to defeat that regulation. If the plan had been only what is now claimed, there was no apparent motive for the substitution of the water. It would have been far simpler merely to secrete the original packages and never take them to Niagara Falls. Taking out the whisky and putting back water though a hole that could be covered beyond observation, and leaving upon the barrels all the export permits and marks, point strongly, if not inevitably, to the conclusion that the plan was to ship these barrels into Canada, and to seem to comply with the conditions of the bond, and thus avoid liability thereon.

[3] As to Dammeyer's barrels, the proof of the water substitution is direct. As to Parilla's, it rests on inference; but that is sufficient. They were traced into Parilla's possession at his farm, and later were found empty near by, and were evidently emptied through small holes intended to be covered and concealed. The intent to refill them with water is the natural inference from this method of emptying them. We therefore conclude there was, on the facts, a case for the jury as to the general conspiracy, and as to these two defendants.

[4] Respondent David Friedman is not shown to have been originally connected with the plan. He had been engaged to carry the liquor on his trucks from Youngstown to Niagara Falls, but that plan had been abandoned, and he carried Dammeyer's barrels from the distillery to Dammeyer's former saloon, and then later, when a car was secured at the railway station, was to take them there and load them on the car. In the meantime he was found in Dammeyer's place, with the party which was engaged in substituting water for whisky in the barrels, by using a pump and hose, and his brother Bert was actively participating in this transfer. Clearly, if David Friedman was taking an active part in this transfer, or if he was standing by and acquiescing, waiting until it should be finished, in order that he might take the next step in the plan of shipping the water barrels to Canada, there would be sufficient reason for the jury to infer his participation in the conspiracy. A witness claims to have seen and recognized him helping in the pumping. He admits having had the pump hose in his hands, but claims that he had just observed what was going on and was trying to take his brother away. Whether the prosecution was right in its theory or whether his explanation of the suspicious circumstances should be believed, was clearly for the jury.

[5-7] Upon cross-examination of Counts, one of the officers, he testified that after the discovery of the plan, and the seizure of the liquor by the officers, and the arrest of respondents, Bert Friedman made a statement to Counts that he (Bert) had been transferring the liquor under the direction of his brother David, the defendant. This statement was after the conspiracy had been frustrated, and was not in the presence of David. It was clearly inadmissible as against him, and its reception would be error, save for the circumstances under which it occurred. On direct examination Counts had not referred to this subject. Counsel for David first inquired about it, and therefore made Counts his own witness. The question in effect was, "On this

occasion did not Bert say to you that he had been transferring the liquor himself?" and the answer in effect was, "No; he said he was doing it under David's direction."

Counsel immediately objected to the last statement as volunteered, and asked that it be stricken out, because not responsive. The court rightly overruled this motion. An answer which purports to give the whole of the statement concerning which a question is asked cannot be said to be irresponsive. Counsel then moved to strike it out, because it was hearsay as against David and could not bind him. This motion was overruled, for the reason that counsel could not strike out an answer which he had invited. In this, also, we think the court was right. There may be cases where an answer is formally responsive, but yet where a part of it is so plainly incompetent and so far beyond anticipation that examining counsel would not be estopped to move to strike out that part; but this question clearly expected and invited, and tried to bring into the case, the wholly incompetent fact that Bert Friedman had himself assumed the whole burden and insisted that his brother was not guilty. Counsel cannot ask such a question, and take the benefit of it if he likes the answer, but strike the answer out if it is harmful.

[8] A witness testifies that at the time the enforcement officers entered Dammeyer's place, and found Dammeyer and Friedman there, and the substitution going on, Dammeyer said to the officers that he had been induced to adopt the plan by the suggestions of Parilla and Friedman. Friedman said nothing in contradiction. Whether he was so near that he would have heard the statement was a disputed inference. The court charged that if this statement was made in the presence of Friedman, and he kept silent, that would be evidence tending to show his guilt. There are two criticisms upon this charge. The first is that whether the statement was made in Friedman's presence was not important; it was immaterial, unless made within his hearing. The court's charge was verbally inaccurate in this respect; but we do not think the inaccuracy substantial. It must have been obvious to the jury, as to every one, that Friedman could not be called upon to deny a statement which he did not hear, and that the charge could not have been intended to convey any such idea. We cannot think a jury would be misled.

[9] The second criticism is that, under existing circumstances there was no obligation for Friedman to deny the statement, if he did hear it; and this claim is based upon the decisions that one who is under arrest or in custody is so far under duress that he may keep silence without prejudice (as in Com. v. Kenney, 53 Mass. 235, 237, 46 Am. Dec. 672). This was not the situation here. There was no color of duress. No warrants had been issued. The prohibition officers were merely inquiring and investigating. A protestation by Friedman that Dammeyer's charge was untruthful would have been natural, and its absence had evidential force.

We have considered the other errors argued in the briefs, but we find nothing requiring further comment. The convictions and sentences are affirmed.